**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                                MASTER FILE NO. 12-md-02311

_____

In Re: Occupant Safety Restraints                    HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:                          2:12-cv-00601

Direct Purchaser Actions

_____/

**OPINION AND ORDER DENYING DEFENDANTS' COLLECTIVE**
**MOTION TO DISMISS DIRECT PURCHASER ACTIONS**

Before the Court is Defendants' Collective Motion to Dismiss Direct Purchaser

Plaintiffs' (DPPs) Amended Class Action Complaint (12-601, Doc. No. 75). Prior to the

hearing on the motion scheduled for June 4, 2014, Defendants waived oral argument.

The Court has reviewed all of the filings, and for the reasons that follow, the motion is

**DENIED**.

**I. INTRODUCTION**

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation

("Judicial Panel" or "Panel") transferred actions sharing "factual questions arising out of

an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of

automotive wire harness systems" to the Eastern District of Michigan. (12-md-02311,

Doc. No. 2).  In its transfer order, the Judicial Panel noted that the majority of cases were pending in the Eastern District, as was the first filed action, that several defendants were located in this district, and that a related criminal investigation was underway in this district.  (Id.)  The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources.  (Id.)   After complaints were filed alleging conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the case.  The Judicial Panel noted the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.  The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed "In re: Automotive Parts Antitrust Litigation."  (Doc. No. 117 in 12-2311).  There are now twenty-nine component part cases pending.  (See Doc. No. 753 in 12-2311).

On July 13, 2013, Direct Purchaser Plaintiffs filed their Consolidated Amended Class Action Complaint ("CACAC"), alleging Defendants conspired to rig bids, fix, raise, and maintain prices for Occupant Safety Systems ("OSS") sold in the United States. (Doc. No. 65 in 12-601).  Defendants assert that the Direct Purchasers' CACAC must be dismissed for four reasons:  it fails to meet the minimum requirements for pleading an antitrust conspiracy; damages are unavailable to DPPs because they lack standing to bring a claim for money damages under the Sherman Act; the statute of limitations

2

bars claims accruing before July 21, 2008; and DPPs are not entitled to injunctive relief because the allegations of threatened future injury are not plausible.

## II.  FACTUAL ALLEGATIONS

After Defendants filed their motion to dismiss, DPPs filed a Second Consolidated Amended Class Action Complaint ("SCACAC") to extend the class period and to reflect the guilty pleas and criminal informations filed after the first consolidated amended complaint was filed.  (See Doc. No. 85).  The SCACAC contains party allegations, class allegations, and allegations about the product, the nature of the conspiracy, the market conditions, and guilty pleas entered by Defendants.  The parties stipulated that Defendants could supplement their motion or merely reincorporate their motion. Defendants did not file any supplemental pleadings.  In referencing the allegations set forth below, the Court cites to the Consolidated Amended Class Action Complaint for the most part inasmuch as the parties' briefs cite to that pleading.  Any allegations advanced solely in the SCACAC will reference that document.

### A.  The Parties

Direct Purchaser Plaintiffs, Beam's Industries, Inc. and Findlay Industries, Inc. bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States arising out of DPPs' purchase of Occupant Safety Systems ("OSS"), which includes seat belts, airbags, steering wheels or steering systems, and safety electronic systems.  (Doc. No. 65 at ¶¶ 13, 14, 8).  Plaintiffs purchased OSS directly from one or more Defendants during the Class Period.  (Doc. No. 65 ¶¶ 13, 14).

According to paragraphs 20-28 in the CACAC, Defendants directly or through

3

their subsidiaries, manufactured, marketed or sold OSS in the United States.

Defendants include four corporate groups:  Takata Corporation, TK Holdings, Inc.

(collectively "Takata"); Tokai Rika Co., Ltd. and TRAM, Inc. (collectively "Tokai Rika");

TRW Automotive Holdings Corporation ("TRW Automotive"), TRW Deutschland Holding

GMBH ("TRW Deutschland") ( collectively "TRW"); and the Autoliv group, which has

received preliminary approval of a proposed settlement.  (See Doc. No. 97).  DPPs

allege that others participated in the conspiracy, and Defendants are jointly and

severally liable.  (Doc. No. 65 at ¶ 31).

### B.  Class Allegations

DPPs bring this action on behalf of themselves and all others similarly situated.

They allege that they purchased OSS during the Class Period, which is defined in the

CACAC as "from at least as early as January 1, 2003, through the present." (Doc. No.

81 at ¶ 7).

### C.  Product and Nature of the Conspiracy

DPPs claim that they were injured by a conspiracy among Defendants to fix

prices on OSS, which "are designed to protect drivers and passengers from bodily

harm."  (Doc. No. 65 at ¶ 43).  DPPS allege that OSS parts are installed in new vehicles

and as replacements parts.  (Doc. No. 65 at ¶ 47).   According to DPPs, Defendants

rigged bids for Requests for Quotations issued by Original Equipment Manufacturers

("OEMs").  (Doc. No. 65 at ¶¶ 67-69).  Suppliers to OEMs purchased OSS parts at the

price determined by the OEMs during the RFQ process.  (Doc. No. 65 at ¶ 73).

### D.  Market Conditions

DPPs allege that market conditions are conducive to collusion. Because there are high barriers to entry into the market, the industry is heavily concentrated. (Doc. No. 65 at ¶ 49). Defendants dominate the market. (Doc. No. 65 at ¶ 50). Autoliv, TRW, Takata, and Tokai Rika, together, "control nearly three-quarters of the global market." (Doc. No. 65 at ¶ 50). In its 2011 Annual Report, Autoliv claimed sales represented more than 33% of the global OSS market, (id.), with over $18.1 billion in sales globally, and $4.2 billion in the United States. (Doc. No. 65 at ¶ 51). TRW and Takata each account for 20% of the global market. (Id.)

According to DPPs, Defendants have the ability and expertise to manufacture OSS and the parts included in the definition of OSS for use in any motor vehicle, and Defendants sell OSS to every "significant automobile manufacturer in the United States, Western Europe, and Japan." (Doc. No. 65 at ¶ 53f).

Barriers to entry in the market for OSS exist, including significant start-up capital expenditures; concentration in the market; (Doc. No. 65 at ¶¶ 56-57); relatively inelastic pricing, and a lack of viable substitute products. (Doc. No. 65 at ¶¶ 58-59).

### E. Investigations and Guilty Pleas

Investigations into anticompetitive conduct in the OSS market are ongoing in the United States and other jurisdictions. (Doc. No. 65 at ¶ 76). On February 23, 2010, the Federal Bureau of Investigation raided TRAM, Inc., as part of a Department of Justice ("DOJ") antitrust probe. (Doc. No. 65 at ¶ 77). The following year, in February 2011, the FBI raided TK Holdings, Inc., a wholly-owned subsidiary of Takata Corporation, which subsequently acknowledged in its 2011 Annual Report that TK Holdings, Inc. was the subject of an investigation. (Doc. No. 65 at ¶ 78). Further, the vice president of

5

marketing and public relations indicated that a subpoena was received seeking communications with competitors dating back to January 1, 2005, relating to seat belts, air bags, steering wheels, and safety electronics.  (Id.)   On the same date, Autoliv ASP, Inc. received a grand jury subpoena from the DOJ, relating to its subsidiary, seeking documents and information into antitrust activity.  (Doc. No. 65 at ¶ 79).  Autoliv subsequently pleaded guilty to conspiring to rig bids and to fix, stabilize, and maintain the prices of seat belts, airbags, and steering wheels sold to automakers in the United States and elsewhere.  (Doc. No. 65 at ¶ 84).  Autoliv paid a $15.5 million criminal fine.  (Id.)

TRW also has admitted it is under investigation in the United States and elsewhere, (Doc. No. 65 at ¶ 81), and on September 25, 2012, TRW Deutschland pleaded guilty to engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of seat belts, airbags, and steering wheels in the United States, and it paid a $5.1 million criminal fine.  (Doc. No. 65 at ¶ 89).

On October 9, 2013, the DOJ charged Takata with a conspiring to rig bids and fix prices of seatbelts manufactured for Honda, Nissan, Toyota, Subaru, and Mazda automobiles.  (Doc. No. 81 at ¶¶ 97, 98).  Takata pleaded guilty on December 5, 2013, to engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of seat belts sold to automakers in the United States and elsewhere."  (Doc. No.  81 at ¶ 99) and received a $71.3 million criminal fine.  The following month, the Department of Justice charged employees of Takata with involvement in the conspiracy.  (Doc. No. 81 at ¶ 101-104).

Although Tokai Rika has not pleaded guilty to antitrust violations in the OSS

market, it has pleaded guilty to a heater control panel conspiracy relative to Toyota and pleaded guilty to obstruction of justice.  (Doc. No. 65 at ¶ 91).  Tokai Rika admitted it destroyed documents and deleted electronic data likely to contain evidence of antitrust crimes.  (Id. at ¶ 92).

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' "  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . .  Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice."  Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir. 2009).

## IV.  ANALYSIS

## A.  Plausibility of the Antitrust Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In Twombly, the Supreme Court considered the pleading requirements needed to withstand a motion to dismiss a Section 1 Sherman Act claim.  It held that a complaint must contain "enough factual matter (taken as true) to suggest" the existence of an agreement.  550 U.S. at 556.

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

Id.

The Court begins its analysis here, as it has in all of the component part cases, with a recap of the facts before the Supreme Court in Twombly.  The plaintiffs brought a consumer antitrust class action against local telephone and telecommunications carriers alleging the defendants conspired to restrain trade.  According to the plaintiffs, the defendants engaged in parallel conduct to "inhibit the growth" of companies new to the market and agreed not to compete with each other.  550 U.S. at 550-551.  The defendants moved to dismiss the complaint on the ground that it failed to include factual allegations from which an express or tacit agreement could be inferred.  Id. at 552.

Because the Supreme Court dismissed the antitrust claim in Twombly, the decision does not stand as an example of the type of allegations that would satisfy the

8

plausibility standard.  Nevertheless, the Supreme Court provided general guidance.  It indicated that a "heightened fact pleading of specifics" is not needed to state an antitrust conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough.

In a subsequent decision, Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court addressed whether Twombly was limited to antitrust claims or applied universally. Iqbal, 556 U.S. at 684.  The Supreme Court summarized its decision in Twombly as follows:

> Our decision in Twombly illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct 'effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in Twombly flatly pleaded that the defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry. . .and ha[d] agreed not to compete with one another.' 550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants 'parallel course of conduct. . .to prevent competition' and inflate prices was indicative of the unlawful agreement alleged.  Ibid. (internal quotation marks omitted).
>
> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.  Id., at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the 'nub' of the plaintiffs' complaint "the well-pleaded, nonconclusory factual allegation of parallel behavior' to determine whether it gave rise to a 'plausible suggestion of conspiracy.' Id., at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an

> unlawful agreement, the Court nevertheless concluded that it
> did not plausibly suggest an illicit accord because it was not
> only compatible with, but indeed was more likely explained
> by, lawful, unchoreographed free-market behavior. Id., at
> 567, 127 S.Ct. 1955.  Because the well-pleaded fact of
> parallel conduct, accepted as true, did not plausibly suggest
> an unlawful agreement, the Court held the plaintiffs'
> complaint must be dismissed.  Id., at 570, 127 S.Ct. 1955.

Iqbal, 556 U.S. at 679-80.

This Court has addressed and rejected arguments about the sufficiency of the

complaints in other automotive component parts cases similar to those raised in this

case.  This Court held that those cases could proceed because the complaints included

sufficient allegations to inform the defendants what wrongdoing they were alleged to

have committed and enabled the defendants to respond to the allegations.  Further, the

Court concluded that after reviewing the allegations together, the complaints contained

plausible grounds to infer an agreement.  Plausible grounds were set forth in allegations

about the government investigations, which were used to bolster the plausibility of § 1

claims; the guilty pleas by multiple defendants; the structure of the particular component

part industry; and the allegations demonstrating the defendants' opportunity to meet and

collude.

Although DPPs advance similar allegations here, Defendants argue that

shortcomings in the allegations advanced in this case warrant dismissal; in particular,

those allegations relating to the status of the direct purchaser plaintiffs, the product

definition and the limited guilty pleas.  The Court discusses the distinctions below.

### 1.  Status of Purchasers

Defendants assert that DPPs included only boilerplate allegations and failed to

10

allege that they are suppliers, what particular product they purchased, or even when a purchase was made. Further, Defendants point to the absence of allegations regarding whether DPPs purchased OSS for new vehicles or repair parts, what prices were paid, or from whom the purchases were made or for which vehicle platform.

Despite Defendants' focus on allegations that could be added to the CACAC, there is no heightened pleadings requirement for stating an antitrust claim. Allegations of who, what, when and where are not the litmus test for determining whether a defendant is on notice of the claims. In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) (citation omitted). Here, DPPs allege that they purchased OSS directly from one or more Defendants during the relevant time period. (Doc. No. 65 at ¶¶ 13-14). They have alleged what OSS encompass. They have satisfied their pleading burden. See Starr v. Sony BMG Music Entertainment, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the contention that Twombly requires a plaintiff to identify specifically the time, place, or person related to each allegation of conspiracy); In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1005–06 (E.D. Mich. 2010) (rejecting the dismemberment approach and observing that the plaintiffs identified the corporate players and executives, the general nature of the agreements, locations and time frames so as to enable the defendants to respond).

## 2. Product Definition and Market Allegations

Here, Defendants contend that the CACAC fails because it lacks allegations as to how the parts falling within the definition of Occupant Safety Systems are related, and

11

which particular parts were purchased.  The allegations are similar to those articulated

in the in the wire harness complaint, in that there were no allegations as to which

plaintiff purchased which particular part.  This Court's obligation is not to read each

allegation in isolation nor to nitpick a complaint line by line, paragraph by paragraph.

DPPs allege they purchased the OSS, and they allege what is included within the OSS

definition.  The allegations create an inference that DPPs purchased all of the particular

parts identified as part of OSS.

Defendants further contend that the market allegations are generic.  (See Doc.

No. 65 at ¶¶ 49-59).  In this case, Direct Purchaser Plaintiffs include allegations

reflecting a market conducive to the type of collusive activity that took place:  the market

is highly concentrated, with high barriers to entry, and inelastic pricing.  The Court finds

these allegations sufficient, given DPPs' assertions relative to Defendants' ability to

control the market and the number of Defendants that have pleaded guilty to

participating in a conspiracy to fix prices and allocate market shares in the United

States. (Doc. No. 65 at ¶¶ 55-59; 84, 89).  A review of case law demonstrates that these

allegations meet DPPs' pleading burden.  See Starr, 592 F.3d at 323-24 (citing studies

showing coordinated price increases likely when four leading firms controlled 50-80% of

market); In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1014 (E.D. Mich.

2010) ("oligarchic sellers" conducive to collusion as are "prohibitive entry barriers");

Standard Iron Works v. Arcelormittal, 639 F. Supp. 2d 877, 883 (N. D. Ill. 2009) ("high

barriers to entry" conducive to collusion); In re Carbon Black Antitrust Litig., No. A-03-

10191, 2005 WL 102966 at *6 (D. Mass. Jan. 18, 2005) (denying motion to dismiss

because the plaintiffs alleged, among other things, market conditions that would

12

facilitate the maintenance of an illegal agreement).

Although no Defendant has pleaded guilty to a conspiracy involving electronic safety systems, it is undisputed that price-fixing in the OSS market occurred. Not only do Defendants have notice of the claims against them, the allegations create "a reasonable expectation that discovery may reveal further evidence of an illegal agreement" including electronic safety.  See In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1007-08.  DPPs allege that they purchased OSS within the time period of the conspiracy alleged in the complaint.  The market is conducive to antitrust behavior. Consequently, the Court finds the CACAC passes the plausibility standard.

### 3. Scope of Guilty Pleas

 Three of the four Defendant groups have admitted they met and agreed to allocate supply, rig bids, and fix prices of products falling within the definition of OSS.  In addition, Tokai Rika pleaded guilty to obstruction of justice in that it destroyed electronic data and paper documents likely to contain evidence of antitrust crimes in the Untied States and elsewhere.  Nevertheless, the parties disagree as to how far these pleas can be stretched.  Defendants assert that the DPPs have overreached in the CACAC in that the factual allegations do not support the existence of a conspiracy beyond the Japanese and German OEMs identified in the plea agreements and the specific parts. Moreover, the time frames covered in the guilty pleas are not the same.


The existence of variations in the content of the guilty pleas does not render a conspiracy beyond Japanese and German OEMs implausible.  DPPs allege that they paid more for OSS than otherwise would have been the case in a competitive market.

13

DPPs further allege that Defendants knew and intended that their actions regarding the sale of OSS to motor vehicle manufacturers would have a direct impact on prices for OSS sold to all direct purchasers of OSS throughout the United States.

A review of these factual allegations and the inferences favorable to DPPs, which must be drawn by the Court, distinguish this case from those relied upon by Defendants.  Specifically, this case presents "the 'larger picture' from which inferences of a wider conspiracy can be drawn. . . ." In re Iowa Ready-Mix Concrete, 786 F. Supp. 2d 975, 979 ( N.D. Iowa 2011) (involving bilateral agreements and geographically limited market).  The ongoing investigation into price-fixing in automotive component parts has resulted in myriad guilty pleas.  Here, the CACAC describes the guilty pleas of several Defendants and executives.  The executives admitted they met and agreed to allocate supply, rig bids, and fix prices for OSS.  Consequently, the viability of DPPs' CACAC does not build on allegations of parallel conduct.  Compare In re Travel Agent Commission Antitrust Litig., 583 F.3d 896 (6th Cir. 2009) (alleging only parallel conduct with "no setting" to suggest the existence of an agreement).  Defendants have notice of which Defendants already pleaded guilty to antitrust conduct in the relevant market. Although DPPs have alleged a conspiracy that expands beyond price-fixing OSS sold to Japanese and German OEMs, they have limited their claims to defendants operating in the OSS market.  Compare In re TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827, 2010 WL 2629728 (N.D.Cal. June 29, 2010) (rejecting the plaintiffs' position that the defendants' involvement in a conspiracy relating to one product renders more plausible a conspiracy claim relating to a product deemed a close substitute).  The CACAC identifies the time frame of the conspiracy, and the market conditions that support the

14

plausibility of a broader conspiracy than that to which Defendants have pleaded guilty. In contrast to the plaintiffs in Twombly, here, Defendants have admitted to participating in an antitrust conspiracy, and the guilty pleas make clear that at least three of the four groups of defendants availed themselves of the opportunities to conspire in the OSS market.

When read in its entirety, the allegations in the CACAC articulate a plausible antitrust claim based upon the market structure, the government investigations, and the guilty pleas.  Compare In re Air Cargo Shipping Servs. Antitrust Litig. No. MD 06-1775, 2009 WL 3443405 at *1 (E.D.N.Y. Aug. 21, 2009) (holding that admissions of price-fixing by so many defendants rendered a conspiracy claim plausible).  The fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action. Id. at 1011.  Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir. 2002).

At this stage of the litigation, these allegations are sufficient.  DPPs identified the parties to the conspiracy, their market share, the government investigation into the parties' conduct, the products involved, the geographic market affected, and the time frame of the conspiracy.  Compare Mich. Div. Monument Builders of N. Am. v. Mich. Cemetery Ass'n, 458 F. Supp. 2d 474, 480-85 (E.D. Mich. 2006) (dismissing an antitrust conspiracy claim where plaintiffs used the term defendants generically without any allegations as to each individual defendant).  DPPs also alleged methods used to implement the conspiracy.  The key to the CACAC's survival is whether it contains

15

plausible grounds to infer an agreement; not whether an agreement is probable.  In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009).  Such grounds exist.

## B.  Viability of Claim for Damages

The parties dispute whether DPPs may bring a claim for damages under the Sherman Act, which requires DPPs to demonstrate they have antitrust standing.  See Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402 (6th Cir. 2012) aff'd on other grounds, 2014 WL 1168967 (S. Ct. March 25, 2014).  "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry."  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc).

In Static Control Components, 697 F.3d at 402, the Sixth Circuit addressed the factors assessed and balanced when deciding whether a claimant has satisfied his burden to adequately plead antitrust standing.  First, the plaintiff must allege "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused."  Id.  Second, the court considers "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market."  Third, the court looks at "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative."  Fourth, the court must assess "the potential for duplicative recovery or complex apportionment of damages."  Finally, the court must consider "the existence of more direct victims of the alleged antitrust violation."  Id. (citations omitted).

After reviewing the allegations set forth in the CACAC, the Court is satisfied that DPPs have adequately pleaded antitrust standing.  First, the complaint includes

16

allegations that each DPP purchased OSS directly from one or more of the Defendants during the Class Period, and that Defendants' conspiracy impacted the prices DPPs paid for OSS. (Doc. No. 65 at ¶¶ 13-144, 114-15, 122).  According to DPPs, the conspiracy impacts "not only multiple bids submitted to OEMs, but also prices paid by all other direct purchasers of Occupant Safety Systems."  (Id. at ¶ 66).  The allegations of price increases above and beyond what the price would have been in a competitive market satisfies DPPs' burden.  See In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig., CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) (finding it unnecessary for the direct purchasers to "state the actual price that they paid" because they alleged the purchases were made directly from the defendants during the time frame of the conspiracy to fix prices).  These allegations meet DPPs' burden relative to the first and second factors.  Moreover, because DPPs purchased OSS directly from Defendants, there is no need for complex apportionment of damages.  As direct purchasers they are direct victims of the alleged conspiracy, and the third factor is satisfied.

The CACAC meets the balancing test despite the existence of OEMs and the lack of detailed allegations regarding the connection between OSS sold to the identified OEMS and those purchased by DPPs.  To link their purchases of OSS to the alleged conspiracy, DPPs link their purchases to the conspiracy with an allegation that they purchased OSS in the United States from one or more of the Defendants, and that the anticompetitive conduct impacted the independent bid process, resulting in supracompetitive prices paid by direct purchasers, who "pay the winning bidder at least the winning price."  (Doc. No. 65 at ¶ 73).  Further, DPPs allege that the conspiracy was

intended to and did affect the sales prices of OSS to buyers in the United States. (Doc. No. 65 at ¶ 122).

The allegations, when viewed in the light most favorable to DPPs, satisfy their burden.  In sum, DPPs have "causally linked" their antitrust  injury to "an illegal presence in the market."  Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  They allege they paid a higher price for OSS purchased from Defendants than they would have paid absent the alleged conspiracy.  In re Titanium Dioxide Antitrust Litig., No. 10-0318, 2012 WL 3711890, at * 10 (D.Md. Aug. 28, 2012) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968)).

Further, DPPs have established standing under Article III of the Constitution. They have alleged personal injuries "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751 (1984).  Specifically, DPPs have articulated the impact of the alleged conspiracy–they were harmed by paying higher prices because of the conspiracy.  They have satisfied their pleading burden.

## C. Sufficiency of the Fraudulent Concealment Allegations

DPPs filed the initial OSS complaint on July 21, 2012, and allege a conspiracy from at least as early as January 1, 2003.  Defendants maintain that any claims for damages suffered from the conspiracy before July 21, 2008, are barred because the statute requires claims be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997).

Whether the claims prior to July 2008 are barred turns on whether the statute was tolled by the fraudulent concealment doctrine.   A plaintiff must plead three

18

elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants;
> (2) failure of the plaintiff to discover the operative facts that
> are the basis of his cause of action within the limitations
> period; and (3) plaintiff's due diligence until discovery of the
> facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A

plaintiff must plead the factual allegations underlying a claim of fraudulent concealment

with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir.1991).

Because DPPs' failure to discover the operative facts during the limitations period is not

at issue, the Court limits its discussion to the two disputed elements.

### 1.  Wrongful Concealment

To show "wrongful concealment," a plaintiff must show something more than

silence or an unwillingness to reveal wrongful conduct.   Hamilton Cnty. Bd. of Comm'rs

v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d

761, 770 (6th Cir. 2002).  A plaintiff must allege the existence of a "trick or contrivance

intended to exclude suspicion and prevent inquiry."  Pinney Dock & Transp. Co. v. Penn

Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) (quotation omitted).

Notably, the allegations found to be sufficient for wrongful concealment in Carrier

Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In

that case, the  plaintiffs relied on findings from the European Commission that

conspirators "established security rules to prevent a paper trail. . .and used a coding-

system to hide the identity of the producers in their documents and spreadsheets."  Id.

at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated

"active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447

(citing <u>Bridgeport Music, Inc. v. Diamond Time, Ltd.</u>, 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

Here, DPPs allege that their earliest notice came in February 2011, the date that several Defendants were raided.  (Doc. No. 65 at ¶¶ 98, 99).  Although Defendants assert that DPPs had notice earlier because Tokai Rika was raided in February 2010, the CACAC allegations are that there was no information in the public domain about the rigged bids for OSS; Defendants met and communicated in secret, and agreed to keep the facts from discovery.  (Doc. No. 65 at ¶¶ 103, 106).  Defendants represented publicly that their pricing and bidding activities were unilateral, and monitored and enforced adherence to the conspiracy and destroyed documents.  (Doc. No. 81 at ¶¶ 88, 98h).

The Court found similar allegations sufficient to demonstrate wrongful concealment in other component part cases.  <u>See e.g.</u> <u>In re Auto. Parts Antitrust Litig.</u>, 12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013).  Defendants have not provided grounds for distinguishing the situation here; their position about notice in 2010 implicates factual disputes outside the scope of this motion.  Accordingly, the Court finds that DPPs have met their burden to show wrongful concealment.

## 2.  Due Diligence

In deciding whether DPPs have satisfied their burden as to this element, the Court again uses the decision in <u>Carrier Corp.</u>, 673 F.3d at 448-49  (declining to hold that the plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of litigation and without the benefit of discovery") (citing <u>Jones v. TransOhio Sav. Ass'n</u>, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's reluctance to dismiss

20

fraudulent concealment allegations prior to discovery)) to guide its analysis.  See also

Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe

allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early

stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only if, "it

is obvious from the complaint that the plaintiff conducted absolutely no investigation."

Id. (citation omitted).   Actions that would deceive a reasonably diligent plaintiff toll the

statute.

        In Carrier Corp., the Sixth Circuit was satisfied that due diligence had been

pleaded because the plaintiff detailed the steps it had taken once it became aware of

the EC investigation.  See 673 F.3d at 448.  In the CACAC, DPPs allege that they had

no knowledge and that they could not have discovered the conduct earlier through the

exercise of reasonable diligence.  (Doc. No. 65 at ¶ 111).  Their only argument

advanced that DPPs ignored available information that would have aroused suspicion

and prompted an investigation arises out of the DOJ raid on Tokai Rika.  Again, the

dispute is factual.  The Court credits the allegation, as it must under Rule 12(b)(6).

DPPs assert that until the February 2001 search of TK Holdings, Inc, information in the

public domain did not suggest a conspiracy to fix prices or rig bids of OSS.  Although as

the DOJ investigation has unfolded it has become evident that antitrust conspiratorial

conduct in the auto parts industry is rampant, the conduct remained, for the most part,

hidden in 2010.   In sum, DPPs have included allegations as to each element that must

be proven to toll the statute of limitation.

        **D.  Sufficiency of the Injunctive Relief Request**

        DPPs ask the Court for an injunction preventing Defendants from "continuing and

maintaining" the price fixing conspiracy.  (Doc. No. 65, Prayer for Relief at ¶ D).  The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Defendants argue that the CACAC lacks the factual support necessary to establish a real or immediate threat that DPPs will be harmed again.  Specifically, Defendants contend that DPPs were not the target of antitrust activity and any real threat of future harm has been eliminated by the guilty pleas.  The Court addressed the same arguments in the prior component part cases.  The analysis applies with equal force to the OSS complaint.

DPPs have alleged facts from which a "cognizable danger of recurrent violation" can be inferred.  See  United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). Specifically, DPPs allege a decade-long conspiracy in a market with high barriers to entry.  (Doc. No. 65 at  The same market conditions exist today.  See In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a nationwide class for injunctive relief based upon similar allegations).  DPPs further allege a continuing conspiracy with a Class Period through the present, involving contracts signed pursuant to RFQs that last for at least five years.  The fact that some Defendants have pleaded guilty does "not obviate the threat that a conspiracy will persist or resume in the future."  In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 597 (N.D. Cal. 2010) amended in part, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (certifying a nationwide injunctive class under Rule 23(b)(2)).

22

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

Date:   August 29, 2014                              s/Marianne O. Battani
                                                     MARIANNE O. BATTANI
                                                     United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 29, 2014.


                                                     s/ Kay Doaks
                                                     Case Manager